[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: APPLICATION FOR DISCHARGE OR REDUCTION OF MECHANIC'S LIEN
This case comes to this court as a hearing on a Motion to Discharge or reduce a Mechanic's Lien.
I. BACKGROUND
In the year 2000, the Plaintiff/Applicant Stamford Greyrock, LLC d/b/a Cappelli-Greyrock, LLC ("Stamford Greyrock") was the owner of certain real property located on Forest Street in Stamford, Connecticut (the "Premises"). Stamford Greyrock retained EF/Walsh, Fuller, LLC ("EF/Walsh") to act as its agent to construct a high rise apartment building known as Greyrock Tower on the Premises. In May of 2000, EF/Walsh sub-contracted with Defendant/respondent Collavino Northeast Construction Co., LLC ("Collavino") to have Collavino act as the structural concrete sub-contractor for Greyrock Tower. In late 2001, a dispute arose between EF/Walsh and Collavino regarding final payment under the contract.
On February 28, 2002, Collavino recorded a Mechanic's Lien against the Premises in the amount of $2,700,000.00. Stamford Greyrock initiated this action to reduce or discharge the lien. Stamford Greyrock and Collavino agreed that the Mechanic's Lien would be replaced by a surety bond in the amount of $1,500,000.00. Stamford Greyrock obtained the surety bond and Collavino released the Mechanic's Lien. Stamford Greyrock now seeks to reduce the amount of the bond to less than $1,500,000.00 or discharge the bond entirely.
The parties presented evidence to this court (Karazin, J.) on August 26, September 4, and September 6, 2003.
II. CLAIMS OF THE PARTIES
CT Page 409
Collavino asserts that it has established probable cause to sustain the validity of the bond in the amount of $1,500,000.00. Collavino further asserts that Stamford Greyrock has not established by clear and convincing evidence that the bond should be reduced or that the bond is not valid.
As an aid to the Court, the parties have prepared outlines of their monetary claims which have been submitted as Exhibits 2-A (Collavino's summary of claims) (See Exhibit 2-A attached hereto) and Exhibit A-i (Stamford Greyrock's summary of claims). Although these exhibits are for identification only, the parties have agreed that the court may view those exhibits as an aid. Collavino asserts that it has established probable cause for the court to find that EF/Walsh owes Collavino $2,499,447.91 and therefore the surety bond obtained by the Stamford Greyrock should remain at the amount of $1,500,000.00.
III. FINDINGS OF FACT
The Court finds the following facts:
A. BACKGROUND
1. During the relevant time period of between May 18, 2000 and February 28, 2002, Stamford Greyrock was the owner of certain real property located on Forest Street in Stamford, Connecticut (the "Premises"). (See Application for Discharge or Reduction of Mechanic's Lien dated March 26, 2002 and testimony of John Bernabei.)
2. At some time prior to May 18, 2000, Stamford Greyrock retained EF/Walsh, Fuller, LLC ("EF/Walsh") to act as its agent and as the general contractor for the construction of a highrise apartment building ("Greyrock Tower") on the Premises. (Testimony of Mario Orgera and John Bernabei and see Exhibit One, the subject contract, which names EF/Walsh as agent of the owner.)
3. On May 18, 2000, EF/Walsh as the agent of Stamford Greyrock entered into a subcontract (the "Contract") with Collavino Northeast Construction Co., LLC ("Collavino") in the amount of $11,054,000.00, whereby Collavino agreed to act as the sub-contractor for the structural concrete work at Greyrock Tower. (See Exhibit 1.) The concrete floors would be reinforced by "post tension" cables which would be tightened to add strength to the concrete. Id.
4. Mario Orgera was the manager of the job for Collavino. (Testimony of CT Page 410 Orgera.) John Mallozzi, a professional engineer licensed by the states of Connecticut and New York, acted as a consultant to Collavino and assisted Orgera with the management of the work under the Contract. (Testimony of Mallozzi.) Mario Collavino is the President of Collavino. (Testimony of Mario Collavino.) James Bruno was the job superintendent at Greyrock Tower for EF/Walsh. (Testimony of Orgera.) John Bernabei was a vice-president of EF/Walsh. (Testimony of Bernabei.) John Lundberg was a vice-president of Fox Steel, Inc. which was a subcontractor to Collavino and supplied the post-tension cables. (Testimony of Lundberg.)
5. Collavino began its work under the Contract in May, 2000. (Testimony of Mario Orgera.)
6. The Plaintiff and Defendant agree to certain add-ons to the Contract price. Exhibit 10 is a "spread sheet" containing certain add-ons and deductions from the contract price. The Plaintiff and Defendant agree to the add-ons listed in Exhibit 10 except for item 34 which is a charge for the crane at the Premises in the amount of $84,863.00. Accordingly, the parties agree that there were add-ons of at least $835,586.80.
7. The Plaintiff and Defendant also agree to certain deductions from the Contract price contained in Exhibit 10. The Plaintiff and Defendant agree to the deductions in Exhibit 10 except for item 43 which was a payment made by EF/Walsh to D J Concrete in the amount of $76,025.00. Accordingly, the parties agree that there were deductions of at least $612,840.73.
8. The Plaintiff and Defendant agree that the service of the subject Mechanic's Lien and Notice of Intent to File Mechanic's Lien by the marshal was made on the proper parties. (See Stipulation of Parties dated September 5, 2002.)
9. The Plaintiff and Defendant agree that the content of, and the property description contained in, the subject Mechanic's Lien and Notice of Intent to File Mechanic's Lien are valid. (See Stipulation of Parties dated September 5, 2002.)
10. The Plaintiff and Defendant agree that Plaintiff has validly substituted a surety bond in the amount of $1,500,000.00 in lieu of the subject Mechanic's Lien. (See Stipulation of Parties dated September 5, 2002.) Stamford Greyrock is a principal on the surety bond and Collavino is the obligee. (See Exhibit H, surety bond.)
B. TIMELINESS OF MECHANIC'S LIEN
CT Page 411
1. Substantial completion of Collavino's work under the Contract occurred on November 15, 2001. (See Exhibits B and I.) Work continued after November 15, 2001. (Testimony of Bernabei.)
2. Mario Orgera continued working at the job site with men working under him after November 15, 2001 and through December 6, 2001. (Testimony of Orgera.)
3. Between December 7, 2001 and January 7, 2002, Mario Orgera continued to stop at the Premises each work day to see if anything needed to be done regarding the concrete. (Testimony of Orgera.)
4. On January 7, 2002, at the Premises, Bruno hand-delivered to Orgera a letter addressed to Collavino, Exhibit 23. (Testimony of Orgera.)
5. The Bruno letter of January 7, 2002 (Exhibit 23) stated that a cable had blown out of the ceiling of Apartment 1512 and that "[a]ny and all costs, time wise and monetarily will be charged against your contract." The only contract between EF/Walsh and Collavino was the subject Contract. (Testimony of Orgera.)
6. After hand-delivering the January 7, 2002 letter (Exhibit 23) to Orgera, Bruno requested that Collavino repair the damage to apartment 1512. (Testimony of Orgera.)
7. On January 8, 2002, Orgera brought several workers (laborers and masons) to the Premises and began repairing the damage in Apartment 1512. (Testimony of Orgera.) The work took several days and consisted of chipping out the concrete in the ceiling around the cable, patching the space around the cable with concrete, re-applying the "popcorn" ceiling, painting the ceiling and clean-up. (Testimony of Orgera and Bernabei.)
8. Bernabei acknowledged that Orgera performed the aforesaid work in apartment 1512 at the Premises in January, 2002. (Testimony of Bernabei.)
9. The Mechanic's Lien was recorded on the Stamford Land Records on February 28, 2002. (See Exhibit 27, Mechanic's Lien with stamp of Town Clerk dated February 28, 2002 and Exhibit 28, Notice of Intent.)
10. The marshal completed service of the Mechanic's Lien and Notice of Intent to Claim Mechanic's Lien on the parties on March 6, 2001. (See Exhibits 27 and 28.)
C. PLYWOOD REMOVED FROM JOB SITE BY EF/WALSH
CT Page 412
1. The structural concrete under the contract required the use of concrete forms which consisted of metal supports and plywood and into which the concrete would be poured. (Testimony of Orgera, Mallozzi, Mario Collavino and Bernabei.)
2. Collavino purchased plywood for use with concrete forms. (Testimony of Orgera and Mario Collavino.)
3. EF/Walsh moved the plywood purchased by Collavino from the Premises (testimony of Orgera) to an EF/Walsh storage yard in Valhalla, New York where it remained through the date of the hearing. (Testimony of Bernabei.)
4. Bernabei acknowledged that some of the plywood stored in Valhalla would possibly used again by EF/Walsh or one of its member companies. (Testimony of Bernabei.)
5. Collavino incurred a cost of $46,640.00 for the plywood taken by EF/Walsh. (See Exhibit 3, Invoices from Feldman Lumber, and Exhibit 4, Summary of Plywood Costs and testimony of Mario Collavino.)
D. ADDITIONAL CONCRETE COST
1. The contract specifications called for so-called "5,000 pound" concrete from the seventh floor to the roof of the building. (Testimony of Orgera, Mallozzi and Mario Collavino.) "6,000 pound" concrete cures better than "5,000 pound" during the cold winter months. (Testimony of Mallozzi.)
2. During the winter of 2000-2001, Bruno instructed Collavino to use "6,000 pound" concrete from the seventh floor to the roof instead of the "5,000 pound" concrete called for in the Contract. (Testimony of Orgera.)
3. Collavino utilized "6,000 pound" concrete from the seventh floor to the roof of Greyrock Tower. (Testimony of Orgera, Mallozzi and Mario Collavino.)
4. The additional cost to Collavino of the "6,000 pound" concrete requested by Bruno was $35,000.00. (Testimony of Mario Collavino.)
E. ADDITIONAL COST FOR CRANE
1. The Contract contained a crane allowance in the amount of $279,000.00. (Exhibit 1, the Contract, P. 1 of 8.) CT Page 413
An allowance is used to estimate the cost of an item in a construction contract and, if the actual cost exceeds the allowance, the contract price will be increased to cover the additional cost. (Testimony of Mallozzi.)
2. The cost of the crane exceeded the allowance of $279,000.00. (Testimony of Orgera, Mallozzi, Mario Collavino and Bernabei.)
3. Mallozzi sent a letter to EF/Walsh dated May 10, 2001 requesting an additional $330,000.00 from EF/Walsh for the cost of the crane. (See Exhibit 6, Mallozzi to Bernabei letter dated May 10, 2001.)
4. The total cost of the crane was $610,462.00 which was $331,462.00 above the allowance of $279,000.00. (See Exhibit 7, Summary of Crane Cost and testimony of Mario Collavino.)
5. In June and July of 2001, Collavino and EF/Walsh entered into discussions regarding the additional cost of the crane. (Testimony of Mario Collavino and Bernabei.)
6. Collavino and EF/Walsh reached an agreement whereby Collavino agreed to accept the discounted amount of $84,863.00 for the cost of the crane if EF/Walsh paid 50% of the total balance due to Collavino by July 20, 2001 and paid the remaining balance due to Collavino by August 17, 2001. (See Exhibit 19 and testimony of Mario Collavino.)
7. Based on the aforesaid agreement, Mario Collavino and Orgera signed Change Order No. 34, Exhibit C, which established the reduced cost of the crane above the allowance at only $84,863.00 which is the amount stated in Exhibit 19. (See Exhibit C, Crane Cost Change Order and testimony of Mario Collavino.)
8. EF/Walsh breached the aforesaid agreement in that it did not make the required payments on July 20, 2001 or August 17, 2001. (See Exhibit 19 and testimony of Mario Collavino.)
9. Mario Collavino sent a letter to Bernabei on August 7, 2001 reiterating the agreed-upon payment terms contained in Exhibit 19 and again requested payment. (See Exhibit 26 and testimony of Mario Collavino.)
10. Bernabei did not respond in writing to challenge the statements of the August 7, 2001 Mario Collavino letter, Exhibit 19. (Testimony of Bernabei.) CT Page 414
F. ADDITIONAL COST ON POOL
1. After work was started on the Contract, EF/Walsh requested that Collavino construct the structural concrete for a swimming pool on the plaza level which was not required under the Contract. EF/Walsh submitted plans to Collavino for the pool. (Testimony of Orgera, Lundberg and Bernabei.)
2. Based on the design documents provided by EF/Walsh, Collavino agreed that it would use steel post tension cables in the concrete for the pool which were already on the job site and remained unused. (Testimony of Orgera, Lundberg and Mario Collavino.)
3. Collavino agreed to construct the pool in accordance with the design documents provided by EF/Walsh and executed Change Order No. 35, Exhibit D, in the amount of $175,000.00. (See Exhibit D.)
4. After Change Order No. 35 was executed, EF/Walsh altered the plans for the pool by changing the size of the pool and adding additional stairs. (Testimony of Orgera and Lundberg.) Collavino constructed the pool in accordance with the new plans and constructed the additional stairs. (Testimony of Orgera.)
5. Orgera designed and framed the additional stairs himself and the project engineer for EF/Walsh then determined the necessary steel reinforcement. (Testimony of Orgera.)
6. As a result of the changes to the pool design which were requested by EF/Walsh after execution of change Order No. 35, Collavino could not utilize the steel cable already on the Premises and incurred additional costs as outlined on Exhibit 8 which is a letter from Mario Orgera to John Bernabei dated November 19, 2001. (Testimony of Orgera.) The additional costs outlined on Exhibit 8 are as follows:
 a. Reinforcing steel and PT [post tension] cable from Fox Steel $50,000.00
b. Concrete (50CY x 97 X 1.05) $ 5,100.00
 c. Labor (carpenters-304 hours, laborers-472 hours, mostly stairs) $30,194.00
d. Equipment $ 1,400.00 CT Page 415
 e. Overhead and profit $70,539.00 ___________ Total (See Exhibit 2-A) $105,234.00
7. Despite the request by EF/Walsh to modify the pool and add the additional stairs after execution of change order no. 35, refused to issue a change order add on in the amount of $105,234.00.
G. ADDITIONAL COST FOR AIR SHAFT EXTENSION AND ELECTRIC PADS
1. EF/Walsh through Bruno requested that Collavino perform extra work not required by the Contract by extending the southeast air shaft and constructing two (2) rectangular concrete "electric pads" which would act as a base for electric equipment such as an air conditioner. (Testimony of Orgera.)
2. As a result of the request by EF/Walsh, Collavino extended the southeast air shaft and constructed two (2) concrete "electric pads". (Testimony of Orgera.)
3. Collavino requested payment from EF/Walsh for the extra work in a letter dated November 19, 2001 from Mario Orgera to John Bernabei. (See Exhibit 11.) The additional costs incurred by Collavino for the extra work on the air shaft and two (2) "electric pads" are outlined in Exhibit 11 as follows:
a. Concrete (18CY x 97 x 1.05) $ 1,833.00
 b. Labor (carpenters-80 hours, laborers 24 hours) $13,416.00
 c. Overhead and profit $ 3,500.00 __________ Total (See Exhibit 2-A) $18,749.00
4. Despite the request, EF/Walsh refused to issue a change order add on in the amount of $18,749.00 for the air shaft and two (2) "electric pads". (Testimony of Orgera.)
H. ADDITIONAL COST FOR FIRE SAFING AND BALCONY EDGE
 PATCHING
1. EF/Walsh through Bruno requested that Collavino perform extra work not required under the Contract by fire "safing" the stairways, patching CT Page 416 balcony edges and patching garage floors. (Testimony of Orgera.)
2. The fire safing consisted of patching the concrete around vertical pipes which passed through the horizontal concrete floors in the stairwells. (Testimony of Orgera.)
3. The holes in the concrete which allowed the pipes to pass through the floors were larger than the pipes and had to be patched so that fire could not spread through the hole. (Testimony of Orgera.)
4. Collavino performed the fire "safing." (Testimony of Orgera.)
5. The initial specifications under the Contract stated that the balcony edges would be covered with siding or flashing. This was changed during construction and the concrete balcony edges were to be exposed. As a result, the concrete balcony edges had to be patched so that they were esthetically acceptable. (Testimony of Orgera.)
6. EF/Walsh also requested that Collavino patch floors in the garage which work was not required by the Contract. (Testimony of Orgera.)
7. Collavino performed the extra work of fire safing the stairwells, patching the balcony edges and patching the garage floors and requested a change order by letter dated November 19, 2001 from Mario Orgera to John Bernabei. (See Exhibit 9.) The additional costs for the aforesaid work are outlined in Exhibit 9 as follows:
a. Labor (616 hours) $23,069.00
 b. Overhead and profit $4,600.00 __________ Total (See Exhibit 2-A) $27,669.00
8. Despite the request, EF/Walsh refused to issue a change order add on in the amount of $27,669.00. (Testimony of Orgera.)
I. DELAY OF PROJECT
1. The excavation work at the Premises was still in progress when Collavino began its work under the Contract in May, 2000. (Testimony of Orgera and Mallozzi.)
2. Collavino was not responsible for excavation under its Contract. (See Exhibit One and testimony of Orgera and Mallozzi.) CT Page 417
3. Page 19 of 19 in Schedule B to the Contract (Exhibit One) contains the following milestone dates:
a) Plaza flatwork to be complete no later than August 15, 2000;
b) Roof flatwork to be completed no later than December 24, 2000;
 c) Substantial completion (other than punch list) no later than January 15, 2001.
4. EF/Walsh breached the Contract by failing to provide a work site which would allow Collavino to meet the milestone dates. (Testimony of Orgera, Mallozzi and Mario Collavino.)
5. Due to the delay in the excavation, Collavino was unable to complete the plaza flatwork by August 15, 2000, the milestone date in the Contract. (Testimony of Orgera, Mallozzi and Mario Collavino.)
6. John Mallozzi recorded a videotape of the Premises in the last few days of August, 2000. (See Exhibit 25, Videotape of Premises and testimony of John Mallozzi.)
7. Exhibit 25 demonstrated that the excavation was ongoing at the end of August and that it would have been impossible for Collavino to have completed the plaza flatwork at that time which was already after the milestone completion date of August 15, 2002. (Testimony of Orgera and Mallozzi.)
J. COSTS OF WINTER CONDITIONS
1. As a further result of the delay in excavation, Collavino was unable to complete the job by January 15, 2001 and the work continued through the particularly harsh winter of 2000-2001. (Testimony of Orgera, Mallozzi and Mario Collavino.)
2. The conditions during the winter of 2000-2001 caused Collavino to provide the following additional materials for the Premises in the amount of $93,905.34:
a. Collavino purchased insulated blankets from OG Industries, Inc. for $14,784.14 which were used to cover the concrete while it cured. (Testimony of Mario Collavino and see Exhibit 14 which contains a summary page and the invoices from OG Industries, Inc. for the blankets.) CT Page 418
b. Collavino was required to pay OG Industries, Inc. an additional $19,978.75 which consisted of a charge of $2.50, for each cubic yard of concrete, to heat the water which was used to make the concrete. (Testimony of Mario Collavino; see also Exhibit 12, invoices from OG Industries, Inc. which include the additional charge of $2.50 in the price of each cubic yard of concrete, and Exhibit 13 which contains a summary of the heated water costs.)
c. Collavino was required to pay OG Industries, Inc. an additional $54,663.89 which consisted of a charge of $7.50 for each cubic yard of concrete to add a chemical known as "Accelguard" which prevents the concrete from freezing during the curing process. (Testimony of Mario Collavino; see also Exhibit 12, invoices from OG Industries, Inc. which include the additional charge of $7.50 in the price of each cubic yard of concrete, and Exhibit 13 which contains a summary of the Accelguard costs.)
3. Two-thirds, or $62,603.56, of the total costs incurred by Collavino during the winter of 2000-2001 were incurred due to the delay of the job beyond the milestone date of January 15, 2001. (Testimony of Mario Collavino.)
K. COSTS OF EXTENDED GENERAL CONDITIONS
1. The delay in the work under the Contract due to the delay in the excavation caused Collavino to continue running its full concrete construction operation for approximately nine (9) months beyond the initial completion date of January 15, 2001. (Testimony of Mario Collavino.)
2. As a result of this delay, Mario Collavino testified that Collavino incurred the following costs for extended general conditions:
Ford Trucks: $2,976.30; Ford Contour: $2,721.60; Gas: $2,700.00; Insurance: $2,980.50; Trailer: $2,638.38; Telephone: $2,479.24; Utilities: $1,200.00; Rent on yard: $9,600.00; Head office overhead $157,500.00; ADP payroll services $9,410.21; Project manager salary: $133,641.50; Accounting personnel $188,304.40; Administrator $16,758.18.
Total (See Exhibit 2-A) $438,910.31
3. The cost of the extended general conditions were necessary to provide the services and for the construction of Greyrock Tower at the Premises. (Testimony of Mario Collavino.) CT Page 419
L. ADDITIONAL LABOR COSTS
1. The delay in the work under the Contract due to the delay in the excavation caused Collavino to incur additional labor costs in the construction of Greyrock Tower. (Testimony of Mario Collavino.)
2. Collavino calculated its planned labor force to be forty (40) employees on the job for eight (8) hours per day at $37.39 per hour for one hundred sixty five (165) days between June 1, 2000 and January 15, 2001. The cost of the planned labor came to $2,026,982.00. Collavino also estimated a ten (10%) percent labor inefficiency amount for an additional $202,698.20 which made the total cost for Collavino's planned labor $2,229,691.20. (Testimony of Mario Collavino.)
3. Actual labor costs incurred by Collavino were $3,236,250.02. (Testimony of Mario Collavino.)
4. The additional labor costs were caused by to the delay in progress of the work and also due to increased inefficiency of the labor during the cold winter months. (Testimony of Mario Collavino.)
5. Collavino incurred $1,006,524.92 in additional labor costs in the construction of Greyrock Tower due to the result of the delay of work under the Contract. (Testimony of Mario Collavino.)
IV. LAW
 A. STATUTORY CONSTRUCTION
In Mattson v. Tarte. 247 Conn. 234 (1988), the Connecticut Supreme Court restated the rules of statutory construction regarding Mechanic's Liens statutes as follows:
 We begin our analysis by noting that in Connecticut, the mechanic's lien is a creature of statute and gives a right of action which did not exist at common law. The purpose of the mechanic's lien is to give one who furnishes materials or services the security of the building and land for the payment of his claim by making such claim a lien thereon.
Moreover, the guidelines for interpreting mechanic's lien legislation are . . . well established. Although the mechanic's lien statute creates a statutory right in derogation of the common law, its provisions should be liberally construed in order to implement its remedial purpose of CT Page 420 furnishing security for one who provides services and materials. Our interpretation, however, may not depart from reasonable compliance with the specific terms of the statute under the guise of the liberal construction. Mattson, supra, 247 Conn. At 237-238. (Internal citations and quotation marks are needed.)"
Thus, the liberal construction of the Mechanic's Lien statute favors Collavino's lien as security for payment. Stamford Greyrock is still entitled to a full trial on the matter.
B. BURDENS OF PROOF
 1. C.G.S. § 49-37 (b) (5)
Connecticut General Statutes § 49-37 (b) (5) delineates the appropriate burdens of proof at a hearing to reduce or discharge a bond substituted for a Mechanic's Lien and the remedies available. That section provides:
 Upon a hearing held on the application or motion set forth in this subsection, the Obligee of the bond shall first be required to establish that there is probable cause to sustain the validity of the lien. Any person entitled to notice under subdivision (1) of this section [e.g., the principal on the bond] may appear, be heard and prove by clear and convincing evidence that the validity of the lien should not be sustained or that the amount of the lien claimed is excessive and should be reduced. Upon consideration of the facts before it, the court or judge may: (A) deny the application or motion if probable cause to sustain the validity of the lien is established; or (B) order that the bond is void if (i) probable cause to sustain the validity of the lien is not established; or (ii) by clear and convincing evidence, the invalidity of the lien is established; or (C) order the amount of the bond reduced if the amount of the lien is found to be excessive by clear and convincing evidence.
 2. PROBABLE CAUSE/CLEAR AND CONVINCING EVIDENCE STANDARDS
Pursuant to C.G.S. 49-37 (b) (5), the obligee on the bond (the lienor) is first required to establish that there is probable cause to sustain the validity of the lien. "The probable cause standard embodied in the statute is analogous to that provided in the statutory provisions CT Page 421 relating to prejudgment remedies." Pero Building Co. v. Smith, 6 App. 180, 182 (1986). In a Mechanic's Lien case, a Superior Court adopted the prejudgment remedy probable cause standard as follows:
 The hearing in probable cause . . . is not contemplated to be a full-scale trial on the merits of the Plaintiffs claim. The Plaintiff does not have to establish that he will prevail only that there is probable cause to sustain the validity of the claim . . . The court's role in such a hearing is to determine probable success by weighing probabilities. Morever, this weighing process applies to both legal and factual issues. It is the trial court that must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a Plaintiff has sustained the burden of showing probable cause to sustain the validity of its claim.
Santa Fuel, Inc. v. Varga, 2002 WL 322038, p. 2 (Conn.Super. 2002, Thim, J., Exhibit B) citing Blakeslee Arpaia Chapman v. El Constructors,32 Conn. App. 118, 126 (1993).
The Defendant has shown it has a valid claim of at least $1,500,000. Whether Defendant will prevail is a matter which must await trial.
Once the obligee on the bond (the lienor) comes forward with evidence to establish probable cause to sustain the lien, the principal on the bond (the property owner) has the opportunity to present clear and convincing evidence that the lien is invalid or that the lien is excessive. C.G.S. 49-37 (d) (5). Clear and convincing is a "much more difficult burden" than probable cause. Labbe v. Remmco, Inc., 1993 WL 170264, p. 4 (Conn.Super., 1993, Barnett, J., Exhibit C)
 Clear and convincing evidence has a definite meaning in our law. Clear and convincing evidence means proof sufficient to satisfy a court beyond an average of certainty. The definition seems to be universal. The clear and convincing standard of proof is evidence that produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. The standard involves evidence that is very clear, direct, weighty and convincing as to enable the factfinder to come to a clear conclusion without hesitancy of the truth of the precise facts in issue. Id. at 4 (citations CT Page 422 omitted).
 C. VALIDITY OF THE MECHANIC'S LIEN
 1. C.G.S. § 49-33
Connecticut General Statutes § 49-33 creates the right of a subcontractor to assert a Mechanic's Lien for materials furnished or services rendered regarding improvement of land. Section § 49-33 (a) provides in part:
 If any person has a claim for more than $10.00 for materials furnished or services rendered in the construction, raising, removal or repairs of any building . . . and the claim is by virtue of an agreement with or by consent of the owner of the land upon which the building is being erected or has been erected or has been moved, . . . or of some person having authority from or rightfully acting for the owner in procuring the labor or materials, the building, with the land on which it stands . . . is subject to the payment of the claim.
Section 49-33 (b) states that the "claim is a lien upon the land, building and appurtenances or lot . . ."
Thus, the lienor must first show an agreement with the owner or consent of the owner. Defendant has established an agreement with the agent of the owner. All of the Defendant's claims stem from the Contract with the agent of Stamford Greyrock.
Next, the lienor must establish probable cause to conclude that the services or materials were rendered in "the construction, raising, removal or repairs of any building." C.G.S. § 49-33 (a). It is clear that the Defendant has established probable cause that the following claims were rendered in the construction of the building: for plywood (Prop. Findings § C), additional costs of concrete (Prop. Findings § D), the additional crane cost (Prop. Findings § E), the additional cost for the pool (Prop. Findings § F). the air shaft extension and electric pads (Prop. Findings § G), the fire safing and balcony edge patching (Prop. Findings § H), the winter conditions (Prop. Findings § J), and the additional labor costs (Prop. Findings § L). (See Exhibit 2-A attached hereto.)
The costs of the extended general conditions (Prop. Findings § K) CT Page 423 due to the delay (Prop. Findings § I), were arguably not rendered in the construction of the building because these were in the nature of overhead. However, statute § 49-33 specifically includes services and these items are services necessary to provide the concrete work.
2. C.G.S. § 49-34
Connecticut General Statutes § 49-34 provides the procedural requirements for a valid Mechanic's Lien. That statute provides:
 A Mechanic's Lien is not valid unless the person performing the services or furnishing the materials, (1) within ninety (90) days has ceased to do so, lodges with the Town Clerk of the town in which the building, lot or plot of land is situated, a certificate in writing which shall be recorded by the Town Clerk with deeds of land, and (2) within the same time or prior to the lodging of the certificate but not later than thirty (30) days after lodging the certificate, serves a true and attested copy of the certificate upon the owner of the building, lot or plot of land in the same manner as is provided for the service of the notice in § 49-35.
The plain language requires a Mechanic's Lien to be recorded within ninety (90) days after a person has ceased performing services or furnishing the materials. The final date that the Defendant ceased furnishing materials in this case is not in dispute: January 8 or 9, 2002. Substantial completion occurred on November 15, 2002. Collavino presented evidence that Mario Orgera was working on the job site with men through December 6, 2001. Mr. Orgera then continued to stop by the job site every day and on January 7, 2002, James Bruno delivered a letter, Exhibit 23, to Mr. Orgera regarding a blown out cable in Apartment 1512. (Prop. Finding B.4-5.) Mr. Bruno requested that Mr. Orgera repair the problem. (Prop. Finding B.6.) On January 8, 2002, Mr. Orgera and several employees began repairing the problem which took several days. (Prop. Finding B.7.) Bernabei acknowledged that Collavino workers were working on or about January 8, or 9, 2002. (Prop. Finding B.8.) Therefore, the actual date upon which work ceased was at the earliest January 8 or 9, 2002. The Mechanic's Lien was recorded on the Stamford Land Records on February 28, 2002 and served on all parties by March 6, 2002. Accordingly, the lien was clearly recorded and served within ninety (90) days from the cessation of work.
V. CONCLUSION
CT Page 424
This court finds that based on the foregoing that Collavino has established probable cause to sustain the validity of the bond in the amount of $1,500,000. The court finds that Stamford Greyrock has not established by clear and convincing evidence that the bond should be reduced or that the bond is not valid.
 ___________________ KARAZIN, J.
CT Page 425